**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **ESTATE OF JOHN P. O'NEILL, SR.,** ) | | **COMPLAINT** |
| **on behalf of JOHN P. O'NEILL, SR.,** ) | | |
| deceased, and on behalf of decedent's heirs-at-law, ) | | |
| ) | | |
| **J. P. O'NEILL, JR.,** ) | | **CLASS ACTION** |
| ) | | |
| **C. I. O'NEILL,** ) | | |
| ) | | |
| **C. O'NEILL,** ) | | CASE NUMBER: |
| ) | | |
| **D. A. O'NEILL,** ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| **On Behalf of Themselves and** ) | | Jury Trial Demanded |
| **All Others Similarly Situated,** ) | | |
| ) | | |
| v. ) | | |
| ) | | |
| **KINGDOM OF SAUDI ARABIA,** ) | | |
| c/o The Permanent Representative ) | | |
| of the Kingdom of Saudi Arabia ) | | |
| to the United Nations ) | | |
| 360 Lexington Avenue, 11th Floor ) | | |
| New York, NY  10017 ) | | |
| ) | | |
| or ) | | |
| ) | | |
| c/o Royal Embassy of Saudi Arabia ) | | |
| 601 New Hampshire Ave., N.W. ) | | |
| Washington, DC 20037 ) | | |
| ) | | |
| **AGENCIES AND INSTRUMENTALITIES** ) | | |
| **OF THE KINGDOM OF SAUDI ARABIA,** ) | | |
| Directorate of Intelligence ) | | |
| General Staff ) | | |
| Intelligence Section (G-2) ) | | |
| Ministry of State for Internal Affairs ) | | |
| Ministry of Interior ) | | |
| Saudi Committee for Support of the Intifada ) | | |
| Supreme Council of Islamic Affairs ) | | |
| The Supreme Council of Islamic Affairs ) | | |

1

The Council of Ministers )
The Special Committee of the Council )
    of Ministers )
     )
**SYRIAN ARAB REPUBLIC**, )
    c/o Embassy of the Syrian Arab Republic )
    2215 Wyoming Avenue, N.W. )
    Washington, DC 20008 )
     )
**AGENCIES AND INSTRUMENTALITIES** )
**OF THE SYRIAN ARAB REPUBULIC,** )
    National Security Directorate )
    Republican Guard )
    Ministry of Interior )
    Military Intelligence Service )
    Air Force Intelligence )
    Special Forces )
     )
**REPUBLIC OF THE SUDAN**, )
    c/o Embassy of the Republic of the Sudan )
    2210 Massachusetts Avenue, N.W. )
    Washington, D.C. 20008 )
     )
**AGENCIES AND INSTRUMENTALITIES** )
**OF THE REPUBLIC OF THE SUDAN** )
    Ministry of the Interior )
    Ministry of Defense )
    Security of the Revolution )
    Military Intelligence )
    State Security )
    Popular Defense Force )
    Revolutionary Security Services )
     )
And **JOHN DOES 1-99**, )
     )
            Defendants. )
_____)

## CLASS ACTION COMPLAINT

1.      On September 11, 2001, 3029 individuals were murdered when nineteen terrorists

perpetrated an attack on the United States that was unprecedented in history.  The nineteen

terrorists (hereinafter referred to as the "al Qaeda hijackers" or the "hijackers") were members of a terrorist network known as "al Qaeda."  In a coordinated attack, they hijacked four passenger jet airliners, causing two jets to crash into the World Trade Center Towers in New York, and a third to crash into the Pentagon Building in Arlington County, Virginia.  The fourth airliner crashed into a field near the town of Shanksville, Pennsylvania, after innocent passengers challenged the hijackers and prevented them from reaching their apparent destination in Washington, D.C.

2.     The attacks of September 11, 2001, were not isolated incidents, but rather a coordinated effort by the al Qaeda terrorist organization, planned for years by an extensive network of Islamic militants with the support, aid and assistance of banks, governments, and individuals.  The leader of al Qaeda, Osama bin Laden, has admitted his responsibility for planning and carrying out the September 11 attacks.  The al Qaeda organization, with the aid and assistance of various individuals, organizations and governments, sponsored, trained, funded, and supported the hijackers.

3.     Plaintiffs, through their undersigned attorneys, do hereby bring this Complaint seeking damages on behalf of themselves, as descendants and as Executor of the Estate of John P. O'Neill, Sr., deceased, and on behalf of a class of all those similarly situated, arising out of those terrorist attacks.  Plaintiffs demand judgment against the Kingdom of Saudi Arabia, the Syrian Arab Republic, and the Republic of the Sudan, and their agencies and instrumentalities as set forth herein (referred to collectively herein as the "Named Defendants"), and, through their undersigned attorneys, do hereby bring this Class Action Complaint seeking damages arising out of those terrorist attacks, and states as follows:

4.      Plaintiffs are the Estate and immediate family of John P. O'Neill, Sr., former head of the counterterrorism division  of the Federal Bureau of Investigation ("F.B.I.) and the world's foremost expert on Islamic terrorism and Osama bin Laden's terror network.  John P. O'Neill, Sr., was killed in the attacks on the World Trade Center ("WTC").

5.      John P. O'Neill, Sr., became Chief of Security for the World Trade Center less than two weeks prior to the September 11th attacks.  On the morning of September 11, 2001, John P. O'Neill, Sr., was in his office in the WTC South Tower at the time the first plane hit the North Tower.  He immediately left his office and headed to the lobby of the North Tower to determine what had happened and to assess the damage.  A command post was set up in the lobby of the North Tower from which he was able to direct the rescue efforts of the first emergency responders.  When the second plane hit the South Tower, he returned there to coordinate the rescue efforts in that building.  John P. O'Neill, Sr., was killed when the South Tower collapsed.

6.      On the morning of September 11, 2001, al Qaeda hijackers Marwan al-Shehhi, Fayez Ahmed a/k/a/ Bamihammad Fayez, Ahmed al-Ghamdi, Hazma al- Ghamdi, and Molahd al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower (Tower Two) of the World Trade Center in New York City.

7.      On the morning of September 11, 2001, al Qaeda hijackers Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower (Tower One) of the World Trade Center in New York.

8.      On the morning of September 11, 2001, al Qaeda hijackers Khalid al-Midhar,

Nawalf al-Hazmi, Salem al-Hazmi, Hani Hanjour, and Majed Moqued hijacked American

Airlines Flight 77, bound from Dulles Airport in Sterling, Virginia, to Los Angeles, California,

and crashed it into the Pentagon in Arlington, Virginia.

      9.     On September 11, 2001, al Qaeda hijackers Zihad Jarrah, Ahmed Al-Haznawi,

Saeed Al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark,

New Jersey to San Francisco, California, with the intention of crashing that plane into either the

United States Capitol building or the White House in Washington, D.C.  In a heroic act of

defiance and courage, the passengers of Flight 93 overtook the hijackers, and the plane crashed

near Shanksville, Pennsylvania, prior to reaching its target in Washington, D.C.

      10.    All nineteen (19) hijackers were members of Osama bin Laden's al Qaeda

network.  All of the hijackers received sponsorship, funding, training, and other support through

the al Qaeda network.

      11.    Plaintiffs move for judgment against Defendants, jointly and severally.  In support

of their Complaint, Plaintiffs allege as follows:

## <u>JURISDICTION AND VENUE</u>

      12.    Jurisdiction arises pursuant to 28 U.S.C. §§1330(a), 1331 and 1332(a)(2) and 18

U.S.C. §2388.  Jurisdiction also arises based on the Named Defendants' violations within the

meaning of 28 U.S.C. §§1605(a)(2), (a)(5) and (a)(7) (the Foreign Sovereign Immunities Act), 28

U.S.C. §1350 ("Alien Tort Act"), the Torture Victim Protection Act, PL 102-256, 106 Stat. 73

(reprinted at 28 U.S.C.A. §1350 note (West 1993)), and 18 U.S.C. §2333.  Plaintiffs allege that

both personal and federal question jurisdiction exists and arise pursuant to these laws and

statutes.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(2), 1391(d), 1391(f)(1), and 1391(f)(3).

14.     As herein alleged, actions for wrongful death, personal injury and related torts perpetrated by the Kingdom of Saudi Arabia, the Syrian Arab Republic, and the Republic of the Sudan, through their agencies and instrumentalities, and through their officials, employees and agents, fall within the exceptions to jurisdictional immunity under 28 U.S.C. §1605(a)(2), §1605(a)(5), and, in regard to the Syrian Arab Republic and the Republic of the Sudan, §1605(a)(7).

## PLAINTIFFS

### *THE CLASS*

15.     The Plaintiffs specifically named below (the "Class Representatives") bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated persons and entities, as defined as follows:

> **The following persons shall be members of the Class: (1) all spouses, children, parents, or siblings of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001; and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.**

16.     All members of the Class are hereinafter referred to collectively as either the "**Class**" or the "**Plaintiffs**."  All persons who perished as a result of the September 11 terrorist

attacks are referred to collectively as the "**Decedents**."

### ORIGINAL PLAINTIFFS

17.     Plaintiff **J. P. O'Neill, Jr.**, is a United States citizen and a resident of the State of Maryland.  He is the surviving son of **John P. O'Neill, Sr.**, who was killed in the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001

18.     Plaintiff **C. I. O'Neill** is a United States citizen and a resident of the State of New Jersey.  She is the surviving widow of **John P. O'Neill, Sr.**, who was killed in the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

19.     Plaintiff **C. O'Neill** is a United States citizen and a resident of the State of New Jersey.  She is the surviving daughter of **John P. O'Neill, Sr.**, who was killed in the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

20.     Plaintiff **D. A. O'Neill** is a United States citizen and a resident of the State of New Jersey.  She is the surviving mother of **John P. O'Neill, Sr.**, who was killed in the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

21.     Plaintiffs' decedent, **John P. O'Neill, Sr.**, was a United States citizen and a resident of the State of New Jersey.  He was killed in the terrorist attack on the World Trade Center Towers in New York City on September 11, 2001.

22.     Plaintiff the **Estate of John P. O'Neill, Sr.**, is the legal entity created to recover damages on behalf of John P. O'Neill, Sr., deceased, and his heirs-at-law arising from the September 11, 2001 terrorist attack on the World Trade Center.  Plaintiffs J. P. O'Neill, Jr., and C. I. O'Neill are co-executors of the Estate of John P. O'Neill Sr., deceased.

### **DEFENDANTS**

*The Kingdom of Saudi Arabia*

28.     Defendant the Kingdom of Saudi Arabia (hereinafter referred to as "Saudi Arabia") is a foreign state within the meaning of 28 U.S.C. § 1391(f).  Saudi Arabia maintains an embassy within the United States at the Royal Embassy of Saudi Arabia at 601 New Hampshire Avenue, N.W., Washington, DC 20037.

29.     The following Defendants were among the officials, officers, agents, employees, agencies and instrumentalities of the Kingdom of Saudi Arabia through which it caused, supported, and contributed to the terrorist acts that resulted in the death of the Decedents: The Saudi government's Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior.

30.     In addition thereto, through the following agencies and instrumentalities, the Kingdom of Saudi Arabia caused, supported, and contributed to the terrorist acts that resulted in the death of the Decedents:

(a)     The Saudi Committee for Support of the Intifada, a governmental agency run by Interior Minister Prince Nayef bin Abdul Aziz.  As a government agent, Prince Aziz maintains a presence in the United States through the Permanent Representative of the Kingdom of Saudi Arabia to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Royal Embassy of Saudi Arabia, 601 New Hampshire Avenue, N.W., Washington, DC 20037.

(b)     The Supreme Council of Islamic Affairs, an entity established by the Saudi government and run by the Chairman of the Supreme Council, Prince Sultan.  As a government agent, Prince Sultan maintains a presence in the United States through the Permanent

Representative of the Kingdom of Saudi Arabia to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Royal Embassy of Saudi Arabia, 601 New Hampshire Avenue, N.W., Washington, DC 20037.

(c)     The Council of Ministers, an entity established by the Saudi government.

(d)     The Special Committee of the Council of Ministers, an entity established by the Saudi government in 1962.  The Council of Ministers establishes the budget of the Special Committee, which is funded entirely from government funds.

### *The Syrian Arab Republic*

28.     Defendant the Syrian Arab Republic ("Syria") is a foreign state within the meaning of 28 U.S.C. § 1391(f).

29.     Syria maintains an embassy within the United States at 2215 Wyoming Avenue, N.W., Washington, DC 20008.

30.     Defendant Syria is a designated State Sponsor of terrorism pursuant to the Export Administration Act of 1979 and the Foreign Assistance Act of 1961.

31.     The following Defendants were among the officials, officers, agents, employees, agencies and instrumentalities of Syria through which it caused, supported, and contributed to the terrorist acts that resulted in the death of the Decedents: the Syrian National Security Directorate; the Syrian Republican Guard; the Syrian Ministry of Interior; the Syrian Military Intelligence Service; Syrian Air Force Intelligence; and the Syrian Special Forces.

### *The Republic of the Sudan*

32.     Defendant the Republic of the Sudan ("the Sudan") is a foreign state within the meaning of 28 U.S.C. § 1391(f).

33.     Defendant the Sudan maintains an embassy within the United States at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008.

34.     Defendant the Republic of Sudan has, since 1993, been designated a foreign State that sponsors terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405 (j)) and section 602(a) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371(b)) and 28 U.S.C. § 2333.

35.     The following Defendants were among the officials, officers, agents, employees, agencies and instrumentalities of the Sudan through which it caused, supported, and contributed to the terrorist acts that resulted in the death of the Decedents: the Sudanese Ministry of the Interior; the Sudanese Ministry of Defense, the Security of the Revolution; Sudanese Military Intelligence; Sudanese State Security; the Popular Defense Force; the Revolutionary Security Services.

### The Defendants John Does 1-99

36.     Defendants John Does 1-99 are other officials, employees, and/or agencies or instrumentalities of the Kingdom of Saudi Arabia, the Syrian Arab Republic, and/or the Republic of the Sudan, or others, whose identities are presently unknown, who performed acts that resulted in acts of terrorism, including the actions relating to the attacks on the World Trade Center on September 11, 2001, which caused the extrajudicial killing of the decedent John P. O'Neill, Sr., and others.  Defendants John Does 1-99 acted as agencies or instrumentalities of the Kingdom of Saudi Arabia, the Syrian Arab Republic, and/or Republic of the Sudan, performed acts within the scope of their offices, employments and/or agencies, within the meaning of 28 U.S.C. § 1605 note, which caused the extrajudicial killings described herein.

10

## FACTUAL ALLEGATIONS AGAINST THE DEFENDANTS

37.    Defendant Saudi Arabia ("Saudi Arabia" or the "Kingdom") has long provided material support and resources to al Qaeda and affiliated terrorist organizations, persons, organizations, commercial entities, and parties.  On September 11, 2001, nineteen (19) members of the al Qaeda terrorist network hijacked four (4) commercial airliners, and used those planes as weapons in coordinated terrorist attacks on the World Trade Center Complex in New York and the Pentagon in Arlington, Virginia, just across the Potomac River from Washington, D.C.  The fourth airplane was hijacked, but the innocent passengers were able to do battle with the hijackers, and that airplane crashed in Shanksville, Pennsylvania, prior to reaching its apparent destination in or around Washington, DC.

38.    All nineteen hijackers were members of Osama bin Laden's al Qaeda terrorist network.  Fifteen (15) of the nineteen (19) al Qaeda hijackers were Saudi Arabian nationals.  Osama bin Laden, who had been a Saudi Arabian citizen, and al Qaeda have admitted responsibility for the September 11th attacks.  Osama bin Laden and al Qaeda had long been training members of its terrorist network at camps in the Transitional Islamic State of Afghanistan ("Afghanistan").  The Taliban government of Afghanistan had for years sheltered, aided, and abetted Osama bin Laden and al Qaeda, and permitted bin Laden and al Qaeda to operate from bases there.

39.    Saudi Arabia was one of only three nations, along with Pakistan and the United Arab Emirates ("UAE"), to recognize officially the Taliban government of Afghanistan.  Saudi Arabia was the next-to-last nation to sever diplomatic relations with the Taliban after the September 11th attacks.

40.     The September 11th attacks resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.  The Plaintiffs were killed and injured as a direct and proximate cause of the acts of these criminals, and the acts of their al Qaeda co-conspirators and sponsors, and the acts of the Defendants herein to sponsor these reasonably foreseeable acts.

41.     During the summer of 2003, the FBI subpoenaed records for dozens of bank accounts belonging to the Saudi Embassy.  The subpoena was part of a larger investigation approved by the National Security Council working group on terrorism financing.  The activities of the Islamic and cultural affairs office of the Saudi Embassy, as well as the conduct of Saudi Consulates around the United States, are the focus of the investigation.  In particular, the investigation centers on the flow of money to terrorist groups through contributions to charities by the Saudi government and wealthy Saudi citizens.  Money for such charities often flows though the Saudi Embassy's Islamic and cultural affairs bureau.

42.     According to officials at the Department of Homeland Security ("DHS"), the subpoenas were issued after the May 2003 deportation of Fahad al Thumairy, who had worked for the Islamic and cultural affairs section of the Saudi Consulate in California.  Thumairy was deported because of his suspected ties to terrorists.

43.     In 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom for charitable causes without official permission.  Pursuant to High Order No. 296/8, King and Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd") set up a Supreme Council of Islamic Affairs, headed by his brother Prince Sultan Bin Abdul Aziz Al Saud ("Prince

Sultan") to centralize, supervise and review aid requests from Islamic groups.  The Supreme

Council is an arm of the government of Saudi Arabia, and Prince Sultan, who is also Second

Deputy Prime Minister, Minister of Defense and Aviation, and Inspector-General, is the third

highest ranking official of the Kingdom of Saudi Arabia.  This council was established to control

charity financing and distribution of donations to eligible Muslim groups.

44.     The Special Committee of the Council of Ministers was established by High

Order in 1962 and is a department of the Saudi government.  The Special Committee is an organ

of the Council of Ministers and is funded entirely from Saudi government funds.  The Kingdom

of Saudi Arabia, through its agents and instrumentalities, decides which "charities" to fund and

provides grants to selected entities through the Special Committee in furtherance of Saudi

national policy.

45.     The Saudi Arabian government thus had direct supervision and control regarding

the destination of government charity funding and knew, or should have known, that several

entities funded by Saudi Arabia financed the al Qaeda terrorist organization.

46.     According to intelligence experts and officials of the United States Government,

Saudi Arabia has channeled millions of dollars to al Qaeda.  These funds are directed to al Qaeda

through various Saudi-based "charities" which, as described above, are under the Saudi Arabian

government's effective control.  Such charities include, but are not limited to, the Muslim World

League, al-Haramain Islamic Foundation, International Islamic Relief Organization (IIRO),

Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation, Rabita Trust,

SAAR Foundation, Safa Trust, International Institute for Islamic Thought (IIIT), Sanabel Al

Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim Youth (WAMY).

47. The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please . . . I am paid by my organization which is funded by the [Saudi] Government . . . The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.

48. The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government.

49. The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a General Assembly and President who is appointed by the Saudi government.

50. During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding al Qaeda, stating as follows:

> It would be incorrect to view these charities as purely non-governmental organizations . . . . [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi Cabinet Member, chairs the Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable

contributions from the Saudi Royal Family that have been detailed in
Saudi periodicals.

51.     The former director of operations of the State Department's Office of

Counterterrorism, Dick Gannon, stated in October 1998, "We've got information about who's

backing bin Laden, and in a lot of cases it goes back to the royal family [of Saudi Arabia]."

52.     In a separate report, U.S. intelligence reports revealed that Saudi officials began

supporting al Qaeda and Osama bin Laden in 1996.

53.     According to the Chairwoman of the United States Senate Governmental Affairs

Committee, Senator Susan Collins (R. Maine), "Last month [July 2003] the general counsel of

the Treasury Department testified before the Terrorism Subcommittee of the Judiciary

Committee that in many cases Saudi Arabia is the epicenter of terrorist financing."

54.     According to a briefing presented July 10, 2002 to the Defense Policy Board, a

group of prominent intellectuals and former senior officials that advises the Department of

Defense on policy, "The Saudis are active at every level of the terror chain, from planners to

financiers, from cadre to foot-soldier, from ideologist to cheerleader."

55.     In the July 2003 "Report of the Joint Inquiry into the Terrorist Attacks of

September 11, 2001" by the House Permanent Select Committee on Intelligence and the Senate

Select Committee on Intelligence, twenty-eight pages of information reportedly related to Saudi

Arabia's links to terrorism were deleted.  Senator Pat Roberts (R-Kansas), chair of the Senate

Intelligence Committee, says the withholding was mostly unnecessary and was done to "protect

the Saudis."

56.     Princess Haifa, the wife of Saudi ambassador to the United States, Prince Bandar

bin Sultan bin 'Abd-al-'Aziz ("Bandar"), made charitable contributions that may have later

helped two of the September 11 hijackers establish themselves in the United States.

57.     In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd.  Among the items found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children.  An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo.  Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

58.     In March 2002, a raid of the offices of Bosnian Ideal Future, which is the local name under which Benevolence International operated in Bosnia, discovered weapons, plans for making bombs, booby-traps, and false passports.  This search also yielded an al Qaeda organizational chart; notes on the formation of al Qaeda by Osama bin Laden; and "a list of wealthy sponsors from Saudi Arabia," including Osama bin Laden.

59.     In October 2002, Enaam M. Arnaout, the executive director of the Benevolence International Foundation, was charged with conspiracy to provide material support to terrorists, among other charges.

60.      Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities" were funneling contribution to al Qaeda and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations.  Defendant Saudi Arabia knew, or should have known, that al Qaeda and affiliated foreign terrorist organizations, persons,

organizations, commercial entities and other parties would materially benefit from those

contributions, and use the funds received from those "charities" to finance terrorist attacks

against the United States, its nationals and allies.

61.     Despite its express awareness, for several years prior to September 11, 2001 that

Saudi "charities" were funneling contributions to al Qaeda and other terrorist causes, Saudi failed

to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them

from continuing to finance terrorism, in violation of its obligations under United Nations

Security Council Resolutions 49/60, 1269, 133, and 1363.  In this regard, an Independent Task

Force sponsored by the Council on Foreign Relations to investigate the sources of al Qaeda

funding concluded as follows:

> [I]t is worth stating clearly and unambiguously what official U.S.
> Government spokespersons have not:  For years, individuals and charities
> based in Saudi Arabia have been the most important source of funds for al
> Qaeda; and for years, Saudi officials have turned a blind eye to this
> problem.

62.     Defendant Saudi Arabia knew, or should have known, that al Qaeda and affiliated

terrorist organizations, persons, organizations, commercial entities, and other parties would

materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate

the "charities" which were funneling contributions to al Qaeda and otherwise prevent those

"charities" from continuing to finance terrorism.

63.     Defendant Saudi Arabia has long provided material support and resources to a

variety of foreign terrorist organizations which are affiliated with al Qaeda, including, but not

limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity Committee, the Islamic

Society, and Egyptian Islamic Jihad.

64.     By virtue of its affiliation with other foreign terrorist organizations sponsored by Saudi Arabia, al Qaeda has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

65.     Defendant Saudi Arabia knew, or should have known, that al Qaeda would materially benefit from its sponsorship of other foreign terrorist organizations, and that al Qaeda would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

### The Agencies and Instrumentalities of Saudi Arabia

66.     As described above, Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to al Qaeda and Osama bin Laden.  The support provided by Saudi Arabia to Osama bin Laden and al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

67.     The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to al Qaeda.

### The Syrian Arab Republic and its Agencies and Instrumentalities

68.     Defendant Syria has long provided material support and resources to al Qaeda and affiliated foreign FTO's.

69.     Defendant Syria has long provided material support and resources to a variety

of FTO's which are affiliated with al Qaeda, including, without limitation, Hezbollah, HAMAS, and Palestine Islamic Jihad. Syria knew of such FTOs' affiliation with al Qaeda and expected its support to flow ultimately to al Qaeda.

70.     According to the U.S. government, Syria has provided safe haven, financial and logistical assistance, training facilities and political support for Hezbollah. In addition, Syria has for many years facilitated weapons shipments from Iran to Hezbollah. Hezbollah is, in effect, an agency and instrumentality of the Syrian government. By virtue of its affiliation with Hezbollah, al Qaeda has materially benefited from Syria's sponsorship of that FTO.

71.     Through its sponsorship of al Qaeda and affiliated FTO's, persons, commercial entities, and parties, Syria knowingly participated in a conspiracy to commit acts of international terrorism against the United States, its nationals and allies.

72.     Between 1992 and 2003, Defendant Syria continually purchased crude oil from the Republic of Iraq, in violation of United Nations Security Council Resolutions and sanctions programs designed to inhibit Iraq's ability to use funds derived from the sale of Iraq's natural resources to promote international terrorism and pursue the development of weapons of mass destruction. Through its state-controlled bank, Syria assisted Iraq in laundering revenues realized by Iraq through the illegal oil sales, and through other illicit activities.

73.     Syria's violations of the United Nations Security Council Resolutions and sanctions programs, as described above, enabled the Republic of Iraq to maintain and expand its terrorist sponsorship, including its provision of material support and resources to al Quaida and affiliated foreign terrorists organizations, persons, organizations, commercial entities and other parties. At the time Syria knowingly violated these United Nations Sanctions, Syria knew that its

financial assistance to Iraq was being used to fund al Qaeda and the other FTO's referenced herein.

74.     Defendant Syria knew, or should have known, that al Qaeda and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties would materially benefit from Syria's illegal crude oil purchase from Iraq, and from the assistance Syria provided to Iraq in laundering revenues from the illegal oil sales and other illicit activities.

75.     The September 11th attack was a direct, intended and foreseeable product of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, in which Defendant Syria was an active participant.

76.     Absent the material support and resources provided by Defendant Syria, both directly and indirectly, al Qaeda would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack.

77.     Defendant Syria knew, or should have known, that al Qaeda and affiliated FTOs, persons, organizations, commercial entities and other parties would materially benefit from Syria's illegal crude oil purchases from Iraq, and from the assistance Syria provided to Iraq in laundering revenues from the illegal oil sales and other illicit activities.

78.     As described above, Syria acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to al Qaeda and Osama bin Laden.  The support provided by Syria to Osama bin Laden and al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of

September 11th and the extrajudicial killing of the Decedents.

79.     Defendants the Syrian National Security Directorate, the Syrian Republican

Guard, the Syrian Ministry of Interior, Syrian Military Intelligence Service, Syrian Air Force

Intelligence, and the Syrian Special Forces have participated in providing such material support

and resources to al Qaeda.

### *The Republic of the Sudan and its Agencies and Instrumentalities*

80.     Defendant the Sudan has supported, encouraged, sponsored, aided and abetted and

conspired with a variety of groups that use terror to pursue their goals.  The Sudan has long

provided financing, training, safe-haven, paramilitary training, indoctrination, money, travel

documentation, safe passage, and refuge in the Sudan, as well as weapons, for terrorist groups,

including al Qaeda and Osama bin Laden.

81.     Defendant the Sudanese Ministry of the Interior, as the agency responsible for

governing the Sudan's internal affairs, has participated in providing such material support and

resources to al Qaeda.

82.     Defendant the Sudanese Ministry of Defense, as the Sudan's military apparatus,

has participated in providing such material support and resources to al Qaeda.

83.     Defendants the Sudanese Ministry of Defense, the Security of the Revolution,

Sudanese Military Intelligence, Sudanese State Security, the Popular Defense Force, and the

Revolutionary Security Services have participated in providing such material support and

resources to al Qaeda.

84.     Defendant the Sudan openly harbored Osama bin Laden and many top al Qaeda

lieutenants between 1991 and 1996.  During that time, the Sudanese government permitted

Osama bin Laden to establish al Qaeda training camps in the Sudan, set up front companies in the Sudan to move assets and generate new revenues, and to use the cloak of the Sudan's state sovereignty to shield al Qaeda's operations.

85.     In 1996, the Sudanese government permitted Osama bin Laden to move to Afghanistan, where he was welcomed as an honored guest of the ruling Taliban government, rather than surrendering him to international authorities for prosecution.

86.     Defendant the Sudan continues to harbor members of the al Qaeda terrorist network, as well as members of affiliated FTOs, and has recently permitted al Qaeda and other associated terrorist organizations to re-establish training camps within the Sudan, and to otherwise use the Sudan as a base to organize their operations and support their co-conspirators and associates elsewhere.

87.     In addition to its extensive direct support of al Qaeda, Defendant the Sudan has long provided material support and resources to FTO's Egyptian Islamic Jihad and Hezbollah.  By virtue of its merger with Egyptian Islamic Jahad, and affiliation with Hazbollah, al Qaeda has materially benefited from Sudan's sponsorship of those FTOs.

88.     Defendant the Sudan provides material support and resources to al Qaeda, a politico-paramilitary terrorist organization established and headed by Osama bin Laden. Defendant the Sudan funds, supports, sponsors, aids, abets, and provides a safe haven for the al Qaeda terrorist organization and is therefore a state sponsor of al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605(a)(7) note.

89.     Defendant the Sudan maintained close ties with the Republic of Iraq as early as the first Persian Gulf War in 1990, at which time both countries were supporting al Qaeda and

Osama bin Laden.

90.      Defendant the Sudan permitted Iraq to establish a major Iraqi intelligence operation in the Sudan through Iraq's ambassador to Khartoum, Ab al Samad al-Ta'ish.  By allowing Iraqi intelligence to operate within its borders, the Sudan facilitated Iraq's smuggling of weapons and provision of other material support to al Qaeda and Osama bin Laden.

91.      Defendant the Sudan permitted Osama bin Laden to establish his headquarters and base thousands of al Qaeda terrorists within its borders in 1991.  From his headquarters in the Sudan, Osama bin Laden developed contacts with individuals, government entities, and private corporations, named herein, who aided, abetted and materially sponsored the terrorist activities of al Qaeda.

92.      In or about 1991, Sudan through Hassan al-Turabi, leader of the Sudan's ruling National Islamic Front party (or "NIF"), allowed the terrorist Osama bin Laden and his al Qaeda party entrance into Sudan.  During this time period, Sudan abandoned visa requirements for Arabs and actively encouraged Islamic militants to live within its borders.  By the end of 1991, there were between 1,000 and 2,000 members of al Qaeda in Sudan.  Following al Qaeda's move to the Sudan in or about 1991, Osama bin Laden established a headquarters in the Riyadh section of Khartoum, Sudan heavily populated by Saudis.

93.      Osama bin Laden was able to establish a powerful military and political presence in Sudan in the early 1990's, using a variety of business ventures to finance his activities, aided and abetted by certain Defendants named herein.

94.      Osama bin Laden forged business alliances during the early 1990s with wealthy Sudanese, both intimately involved with the Sudanese government.  Osama bin Laden

invested with senior members of the NIF in the al-Shamal Islamic Bank.  Along with other senior members of the NIF, he founded Wadi-al-Aqiq, a trading company that was allowed by the Sudanese government to engage in unrestricted shipping.  Osama bin Laden also founded Taba Investments Ltd., an organization that secured a near monopoly over Sudan's major agricultural exports.  Other enterprises begun by Osama bin Laden include Ladin International Company and al-Hijra Construction.  Gum Arabic Company Ltd. was owned jointly by Osama bin Laden and the Sudanese government.  Osama bin Laden held an interest in al Themar, a Sudanese agricultural company, which employed 4,000 employees working its one-million-acre al-Damazine farms.  Osama bin Laden also held an interest in the Blessed Fruits Company and al-Ikhlas, both involved in the production of honey, fruits and vegetables.

95.      During the early 1990's while Osama bin Laden was in Sudan, the al Qaeda terrorists grew into a sophisticated organization.  It could not have done this without the support of the Sudenese government.  Several key figures in the organization portrayed al Qaeda at the time as a multinational corporation complete with a finance committee, investments and well-organized, concealed accounts and operations worldwide.

96.      Osama bin Laden organized al Qaeda into camps dedicated to export of terrorism throughout Sudan, the main one being a 20 acre site near Soba, 10 kilometers south of Khartoum.  Osama bin Laden and al Qaeda were allowed to operate freely in Sudan.  Al Qaeda purchased communications equipment, radios, and rifles for the Sudanese NIF, while the Sudanese government in exchange provided 200 passports to al Qaeda so that terrorists could travel with new identities.

97.      In or about the early 1990's, Jamal al-Fadl went to Hilat Koko, a suburb of

Khartoum, where he met with representatives of al Qaeda and the Sudanese army to discuss the joint manufacture of chemical weapons.  Al Qaeda and the Sudanese army cooperated in efforts to mount chemical agents on artillery shells.  Al Qaeda at this time also began to experiment with biological warfare injecting or gassing dogs with cyanide.

98.      In Sudan, between the years of 1990 and 1993, members of al Qaeda undertook the task of wiring the *Encyclopedia of the Afghan Jihad*.  Al Qaeda wrote another terrorist work entitled *Military Studies in the Jihad against the Tyrants*.

99.      At various times between in or about 1992 and 1996, Osama bin Laden and Mamdouh Mahamud Salim worked together with a ranking official in the NIF to obtain communications equipment on behalf of the Sudanese intelligence service.

100.     On or at least two occasions in the period from in or about 1992 until 1995, members of al Qaeda transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to the Saudi Arabian peninsula, using vehicles associated with Osama bin Laden's "business."

101.     In 1993, al Qaeda paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, Sudan.  This plane was intended to transport American Stinger Anti-Aircraft missiles from Pakistan to Sudan, although that missile transport did not take place.

102.     Osama bin Laden stated publicly that one of his proudest achievements during the period of time al Qaeda was based in Sudan was al Qaeda's role in the 1993 killing of more than a dozen American soldiers stationed in Somalia.  Al Qaeda and its allies launched operations in Somalia, to foment, and participated in, attack on British and American forces taking part in Operations Restore Hope in Somalia.

103.     In 1995, Hassan al-Turabi organized an Islamic Peoples Congress where Osama bin Laden was able to meet with militant groups from Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and HAMAS.  During the time that al Qaeda was based in Sudan, it forged alliances with Egyptian Islamic Groups and other Jihad Groups.

104.     Hassan al-Turabi, under pressure from the United States and others, expelled Osama bin Laden from the Sudan in 1996 but allowed him to move to Afghanistan.

105.     Because of Sudan's active support for al Qaeda and Osama bin Laden, the United States Department of State first put Sudan on the list of state sponsors of terrorism in 1993.  The Sudan continues to be one of the governments that the United States has designated as a state sponsor of international terrorism.

106.     Sudan serves as a safe-haven for members of al Qaeda, the Lebanese Hezbollah, al-Gama'a al- Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS. Sudan still has not complied fully with United Nations Security Council Resolutions 1044, 1054, and 1070, passed in 1996, which require that Sudan end all material support to terrorists.

107.     As described above, the Sudan acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to al Qaeda and Osama bin Laden.  The support provided by the Sudan and its agencies and instrumentalities to Osama bin Laden and al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

## CLASS ACTION ALLEGATIONS

108.     <u>Class Definition</u>:  Named Plaintiffs bring this action pursuant to Rule 23(b)(3) of

the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated, as members of a proposed Class defined as follows:

> **The following persons shall be members of the Class: (1) all spouses, children, parents or siblings of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia or in the airliner crash in Shanksville, Pennsylvania as the result of terrorist attacks on September 11, 2001; and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings and legal representative of individuals, identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to or otherwise supported the terrorist attacks of September 11, 2001.**

109.   <u>Numerosity</u>:  The members of the Class are so numerous that their individual joinder would be impracticable in that:

(a)   The Class includes the legal representatives and families of over 3,000 people murdered by defendants in the September 11, 2001 attacks in New York, Virginia and Pennsylvania;

(b)   It would be highly impractical and a waste of judicial resources for each of those approximately 3,029 Decedents and their related Class members to be individually represented in separate actions or a single action; and

(c)   Each of the putative Class members seek to recover damages based upon the common and coordinated conduct of the Defendants.

110.   <u>Commonality of Factual and Legal Questions</u>:  Common questions of law and fact exist as to all members of the Class.  These common legal and factual questions include, but are not limited to, the following:

27

(a)      Whether damages alleged by the Class were proximately caused by the conduct of the Defendants;

(b)      Whether Defendants are liable to the Class for damages for wrongful death, survival and intentional infliction of emotional distress;

(c)      Whether the Defendants are liable to the Class for damages pursuant to the Foreign Sovereign Immunities Act, the Alien Tort Act and/or the Torture Victim Protection Act;

(d)      Whether Defendants are liable to the Class for punitive damages;

(e)      What is the proper method for calculating damages for members of the Class;

(f)      Whether members of the Class can gain access to those assets of Defendants that have been frozen by the United States Department of Treasury in order to satisfy a judgment; and

(g)      Whether members of the Class can gain access to those assets of Defendants that have been frozen by foreign states in order to satisfy a judgment.

111.    Typicality:  The claims of the Class Representatives are typical of the claims of all members of the Class in that:

(a)      The Class Representatives and all other Class members suffered damages as the result of common conduct and acts of the Defendants;

(b)      Defendants used identical instruments, methods, and plans to inflict harm upon the Class Representatives and all other Class members;

(c)      The method used to compute compensatory damages will be identical for

28

the Named Plaintiffs and all other members of the Class; and

      (d)    Punitive damages should be awarded against the Defendants for singular acts that impacted the Class Representatives and all other Class members.

112.   <u>Adequacy of Class Representatives</u>:  The Named Plaintiffs are adequate representatives of the Class in that:

      (a)    The Class Representatives and all other Class members have a unity in interest in bringing this action against the Defendants;

      (b)    The Class Representatives have made provision for adequate financial resources to be available for the conduct of this litigation in order to ensure that the interests of the Class will not be harmed; and

      (c)    Members of the Class will be adequately represented by the Class Representatives and their Counsel who are experienced in class action litigation.

113.   <u>Predominance of Common Issues and Efficiency of Class Treatment</u>:  The common issues of fact and law enumerated above predominate over any individual factual or legal issues, and a Class Action is a superior method for the fair and efficient adjudication of those issues in that:

      (a)    Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the burden and expense to all parties and to the court system;

      (b)    By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court; and

(c)     The claims of the Class Representatives and each Class member as set forth above shall be governed by either federal law or substantially identical state law.

114.     **WHEREFORE**, Plaintiffs request that this Honorable Court certify this matter as a Class Action and award Plaintiffs and the Class damages on each of the causes of action stated herein plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## CLAIMS

### COUNT ONE
### *FOREIGN SOVEREIGN IMMUNITIES ACT*

115.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

116.     The actions of Saudi Arabia, and the actions of its agencies and instrumentalities, as described above, forfeited their right to claim immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2) and (a)(5).

117.     The actions of Saudi Arabia and the actions of its agencies and instrumentalities as described herein, conducted commercial activity that had a direct effect in the United States and is not immune pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2).

118.     The actions of Saudi Arabia and the actions of its agencies and instrumentalities, as described herein, are subject to liability from said acts resulting in death in the United States caused by the tortious acts or omissions of the foreign state, officials, and employees while acting within the scope of their office and employment, and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

119.     As a result of the conduct of Saudi Arabia and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

120.     **WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against Saudi Arabia and its Instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the these Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

121.     The actions of  Syria, and the actions of its agencies and instrumentalities as described above, violated the provisions of the Foreign Sovereign Immunities Act 28 U.S.C. §§1605(a)(2), (a)(5), and (a)(7).

122.     The actions of Syria and the actions of their agencies and instrumentalities, as described herein, conducted commercial activity that had a direct effect in the United States and are not immune pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2).

123.     The actions of Syria, and the actions of their agencies and instrumentalities as described herein, are subject to liability from said acts resulting in personal injury and death in the United States caused by the tortious acts or omissions of the foreign state, officials and employees while acting within the scope of their office and employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

124.     The actions of Syria, and the actions of their agencies and instrumentalities

31

designated as state sponsors of terrorism as described herein, are subject to liability for said acts and provision of material support for said acts resulting in death in the United States as a result of torture, extra judicial killing, and aircraft sabotage and have forfeited their right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. § 1605(a)(7).

125.    As a result of the conduct of Syria and their agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, Plaintiffs and Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

126.    **WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against Syria and its Instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the these Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

127.    The actions of the Sudan, and the actions of its agencies and instrumentalities as described above, violated the provisions of the Foreign Sovereign Immunities Act 28 U.S.C. §§1605(a)(2), (a)(5), and (a)(7).

128.    The actions of the Sudan and the actions of their agencies and instrumentalities, as described herein, conducted commercial activity that had a direct effect in the United States and are not immune pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2).

129.    The actions of the Sudan, and the actions of their agencies and instrumentalities as

described herein, are subject to liability from said acts resulting in death in the United States caused by the tortious acts or omissions of the foreign state, officials and employees while acting within the scope of their office and employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

130.    The actions of the Sudan, and the actions of their agencies and instrumentalities designated as state sponsors of terrorism as described herein, are subject to liability for said acts and provision of material support for said acts resulting in personal injury and death in the United States as a result of torture, extra judicial killing, and aircraft sabotage and have forfeited their right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. § 1605(a)(7).

131.    As a result of the conduct of the Sudan and their agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, Plaintiffs and Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

132.    As a result of the conduct of the Sudan and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against the Sudan and its Instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this

33

Honorable Court deems appropriate to prevent the these Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## COUNT TWO
### *TORTURE VICTIM PROTECTION ACT*

133.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

134.    The actions of the Defendants, as described above, subjected the Decedents to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)).

135.    In carrying out the extrajudicial torture and killings of the Decedents, the actions of each Defendant were conducted under actual or apparent authority, or under color of law, of Saudi Arabia, Syria, and/or the Sudan.

136.    As a result of the Defendants' violation of the Torture Victim Protection Act, Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## COUNT THREE
### *ALIEN TORT CLAIMS ACT*

137.    Plaintiffs incorporate herein by reference the averments contained in the preceding

paragraphs as though fully set forth at length.

138.    As set forth above, the Defendants, jointly and severally, caused the deaths of each of the Decedents through and by reason of acts of international terrorism.  These terrorist activities constitute violations of the law of nations, including those international legal norms prohibiting torture, genocide, air piracy, terrorism, and mass murder.

139.    As a result of the Defendants' violation of the law of nations, all Class members suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

140.    Pursuant to 28 U.S.C. §1350, the estates, survivors, and heirs of Decedents who were aliens at the time of their deaths are entitled to recover damages they have sustained by reason of the Defendants' actions.

**WHEREFORE**, Plaintiffs who are estates, survivors and heirs of alien Decedents, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in excess of Ten Billion Dollars ($10,000,000,000), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## COUNT FOUR
### *WRONGFUL DEATH*

141.    Plaintiffs incorporate by reference the averments in the preceding paragraphs as though fully set forth at length.

142.    Decedents are survived by family members entitled to recover damages from all Defendants for wrongful death.  These Plaintiffs and the Class are entitled to damages deemed as

a fair and just compensation for the injuries resulting from the deaths of the Decedents.

143.    The injuries and damages suffered by the Plaintiffs and the Class by virtue of the death of the Decedents, and the consequences resulting therefrom, were proximately caused by the intentional and reckless acts, omissions, and other tortuous conduct of all Defendants as described herein.

144.    As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support.

145.    As a direct and proximate result of the Defendants' intentional, willful, and malicious killing of the Decedents, including barbaric and outrageous acts of murder, the heirs of the Decedents will forever grieve the deaths of the Decedents, and the Plaintiffs and the Class have suffered severe and permanent injuries, damages, and losses, including:

   a.    Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of prospective inheritance; and

   b.    Non-economic damages, including but not limited to the loss of consortium, solatium, society, companionship, care, comfort, love, mental anguish, bereavement and grief.

146.    As a further result of the intentional and reckless acts, omissions, and other tortuous conduct of the Defendants, the Plaintiffs and the Class have been caused to expend various sums to administer the estates of Decedents and have incurred other expenses for which they are entitled to recover.

   **WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an

amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

**COUNT FIVE**
*SURVIVAL*

147.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

148.    Plaintiffs, on behalf of themselves and the class members, bring this action for damages suffered by the Decedents and caused by the Defendants' conduct.  As a result of the intentional and negligent acts of the Defendants, as described above, the Decedents suffered conscious pain and suffering and fear of their impending deaths, were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

149.    As a result of the Defendants' murderous conduct, the Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages, as fully set forth in the paragraphs above which are incorporated herein by reference.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the

Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

**COUNT SIX**
***NEGLIGENT AND/OR INTENTIONAL INFLICTION OF***
***EMOTIONAL DISTRESS***

150.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

151.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.

152.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.

153.    As a direct and proximate result of Defendants' intentional, malicious, willful, unconscionable, reckless, and/or negligent conduct, Plaintiffs and the Class have suffered and will forever in the future suffer severe and permanent psychiatric disorders, emotional distress and anxiety, permanent psychological distress, and permanent mental impairment requiring ongoing and long-term expenses for medical services, care, and counseling, as well as other economic losses.

154.    The Defendants, by engaging in this unlawful conduct, negligently and/or intentionally inflicted emotional distress upon Plaintiffs and the Class members.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand

judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

**COUNT SEVEN**
***CONSPIRACY***

155.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

156.    As set forth more fully above, all Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaeda, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.

157.    As set forth above, all Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property.

158.    As set forth above, the Defendants' conspiracy resulted in the September 11th terrorist attacks that killed the Decedents.

159.    The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth above, to commit acts of international terrorism against the United States, its nationals and allies.

160.    As a result of the Defendants' conspiracy, as set forth above, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

39

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## COUNT EIGHT
### *AIDING & ABETTING*

161.    Through the material support and resources provided to al Qaeda, the Defendants aided and abetted al Qaeda, Osama bin Laden, and the hijackers in their campaign to commit acts of international terrorism against the United States, its nationals, and allies.

162.    The September 11, 2001 attack was a direct, intended and foreseeable product of the aiding and abetting of al Qaeda, Osama bin Laden, and the hijackers by the Defendants.

163.    The damages suffered by the Plaintiffs and the Class, as described in greater detail herein, were the direct and proximate result of the aforesaid aiding and abetting of al Qaeda, Osama bin Laden, and the hijackers by the Defendants, acting individually and in concert with one another and other co-conspirators.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the class members, demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT NINE
### *NEGLIGENCE*

40

164.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

165.    As set forth above, the September 11, 2001 attack was a direct, intended and foreseeable product of a larger conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies.

166.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaeda, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties.

167.    By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents.

168.    The damages suffered by Plaintiffs, the Class, and Decedents, as described herein, were the direct and proximate result of the aforesaid breaches of care by the Defendants.

        **WHEREFORE**, Plaintiffs, on behalf of themselves and the class members, demand judgment in their favor against all defendants, jointly, severally, and/or individually, in an amount in excess of Ten Billion Dollars ($10,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

## COUNT TEN
### *18 U.S.C. §2333 (ANTI-TERRORISM ACT)*

169.    Plaintiffs incorporate herein by reference the averments contained in the preceding

paragraphs as though fully set forth at length.

170.    The September 11th attack constitutes an act of international terrorism within the meaning of 18 U.S.C. §2331.

171.    As set forth above, the Defendants, jointly and severally, caused the deaths of each of the Decedents through and by reason of acts of international terrorism.

172.    As a result of the Defendants' acts of international terrorism, Plaintiffs and the Class suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

173.    Pursuant to 18 U.S.C. §2333, the estates, survivors, and heirs of the Decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

        **WHEREFORE**, Plaintiffs who are nationals of the United States, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of Ten Billion Dollars ($10,000,000,000), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

**COUNT ELEVEN**
*18 U.S.C. §1962(a) – CIVIL RICO*

174.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

175.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering

activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.

176.    The damages suffered by the Plaintiffs and class members, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another.

**WHEREFORE**, Plaintiffs who are nationals of the United States, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of Ten Billion Dollars ($10,000,000,000), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

### COUNT TWELVE
### *PUNITIVE DAMAGES*

177.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

178.    The actions of all Defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all Plaintiffs, the Class, and Decedents.  The Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

179.    As a result of their intentional, malicious, outrageous, willful and wanton conduct,

43

all Defendants are jointly and severally liable to all Plaintiffs and the Class for punitive damages.

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Hundred Billion Dollars ($100,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001, or similar acts.

## COUNT THIRTEEN
### PUNITIVE DAMAGES – THE FOREIGN STATE DEFENDANTS' AGENCIES AND INSTRUMENTALITIES

180.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

181.     The Agencies and Instrumentalities of the foreign state Defendants directly or indirectly caused, contributed to, supported, aided, and abetted the commission of the terrorist acts that resulted in the deaths of the Decedents as described above.

182.     The actions of the Agencies and Instrumentalities of the foreign state Defendants, acting individually and in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the Plaintiffs and the Class and the Decedents.  These Agencies and Instrumentalities of the foreign state Defendants, acting individually and jointly, specifically intended to carry out actions that would end the lives of the Decedents.

183.     Pursuant to 28 U.S.C.A. §1606, which specifically authorizes a claim for punitive damages arising from state-sponsored terrorist acts actionable under 28 U.S.C. §1605 (a)(7), and

for the reasons stated above, the Agencies and Instrumentalities of the foreign state Defendants are jointly and severally liable to all Plaintiffs and the Class for punitive damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment in their favor against the Agencies and Instrumentalities of the foreign state Defendants, jointly and severally, in an amount in excess of One Hundred Billion Dollars ($100,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent the Defendants from ever again committing the terrorist acts of September 11, 2001 or similar acts.

### PRAYER FOR RELIEF

184.    Plaintiffs request that this Honorable Court grant judgment in their favor and against Defendants on Counts One through Fourteen, and grant Plaintiffs and the Class:

a. Compensatory Damages against Defendants, for each cause of action in the amount described above, plus economic damages in an amount to be determined at trial for the Decedent's Estate and the Class;

b. Punitive damages against Defendants in the amount of ONE TRILLION DOLLARS ($1,000,000,000,000.00);

c. Reasonable costs and expenses;

d. Reasonable attorneys' fees; and

e. Such other and further relief that the Court may determine to be just and equitable under the circumstances.

### DEMAND FOR JURY TRIAL

A trial by jury against all Defendants is demanded.

Respectfully submitted,

45

_____

Joshua M. Ambush
LAW OFFICES OF JOSHUA M. AMBUSH, LLC
600 Reisterstown Road
Suite 200 A
Baltimore, MD 21208
Tel.: (410) 484-2070
Fax: (410) 484-9330
Bar Number: MD 27025

Jerry S. Goldman
LAW OFFICES OF JERRY S. GOLDMAN AND
ASSOCIATES, P.C.
111 Broadway, 13th Floor
New York, New York 10006
Tel.: (212) 385-1005
Fax: (212) 346-4665
NY Bar Number: 1302454
S.D.N.Y. Bar No. 8445

*Attorney for the Plaintiffs*